FILED

2006 Dec-20  PM 12:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| SHIMEKA CALHOUN, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | Case No.: 2:04-CV-3480-RDP |
| | } | |
| T-MOBILE USA, INC., | } | |
| | } | |
| Defendant. | } | |

## MEMORANDUM OPINION

The court has before it T-Mobile USA, Inc.'s ("T-Mobile") Motion for Partial Summary Judgment[1] (Doc. # 25) and Motion to Strike the Testimony of Robert Blackshear (Doc. # 37). The motions have been fully briefed and were deemed submitted, without oral argument, on July 12, 2006. (Docs. # 5, 9, 23, 24, 31).  For the reasons outlined below, the court finds that the motion for partial summary judgment is due to be granted. Defendant's motion to strike will be denied.[2]

## I.     Legal Standards for Evaluating a Summary Judgment Motion

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R .Civ. P. 56.  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a

---

[1] T-Mobile has moved for summary judgment on all Plaintiff's claims except those asserted under the Fair Labor Standards Act.

[2] The court has reviewed Defendant's motion to strike and will assume, without deciding, for the purposes of summary judgment only, that it is due to be denied and that the evidence sought to be stricken is properly considered by the court in its summary judgment analysis.  As the court is granting summary judgment in favor of Defendant, it finds that, even considering the evidence sought to be stricken, Plaintiff has not met her burden to refute Defendant's initial showing in connection with its motion for summary judgment.

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 134 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).[3]

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Second, once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the

---

[3] Although Plaintiff's claims of discrimination can be established by direct or circumstantial evidence, *Jones v. BE & K Engineering Co.*, 146 Fed.Appx. 356, 358-59 (11th Cir. 2005), Plaintiff has not offered nor argued direct evidence of discrimination in this case.

decision. *McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02.  The Court is aware that the summary judgment rule applies in job discrimination cases just as in other cases. *Chapman v. AI Transport*, 229 F.3d 1012, 1025 (11th Cir. 2000) (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

## II.   Relevant Undisputed Facts[4]

T-Mobile is a nationwide wireless service provider that operates a number of retail sales kiosks, including one at the Brookwood Mall in Birmingham, Alabama.  (Quann Dep. 92-95; Pl. Dep. 35).  Plaintiff Shimeka Calhoun, who is African-American, worked as a Retail Sales Representative at the T-Mobile Brookwood Mall kiosk from November 17, 2002 until her termination on November 10 or 11, 2003.[5]  (Pl. Dep. 34-35, 178; Doc. # 27, at DX21).  For most of her employment, Plaintiff's immediate supervisor was Crystal Berry (African-American) and her Regional Manager was Gene Quann (White).[6]  (Pl. Dep. 40, 50).  By all accounts, Plaintiff's work performance was very good.  (Berry Aff., at ¶ 5; Shaw Dep.172; Quann Dep. 8; Weeks Dep. 74).

### A.    T-Mobile's Leave of Absence Policy

T-Mobile has a leave of absence policy that provides for both Medical Leave and FMLA leave.  (Doc. # 28, PX 60).  Consistent with federal law, to be eligible for FMLA leave under the T-Mobile policy, an employee must have worked at least 1250 hours in the last 12 months. (Doc.

---

[4] If facts are in dispute, they are stated in the manner most favorable to Plaintiff.  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

[5] Although Plaintiff testified that her date of termination was November 11, 2003 (Pl. Dep. at 178), the termination letter sent to her by T-Mobile set her termination date as November 10, 2003 (Doc. # 28, DX21).  The difference is not material.

[6] Quann became Regional Manager on July 7, 2003.  (Quann Dep. 10).

# 27, DX 7, DX 16; Doc. # 28, PX 60, at 2; Weeks Dep. 136-37).[7]  With respect to Medical Leave, however, a full or part-time employee who has completed ninety days of employment is eligible for Medical Leave or "time away from work temporarily due to prolonged injury."  (Doc. # 28, PX 60, at 2-3).  Employees not eligible for leave under the FMLA or who have exhausted FMLA leave may be eligible for Medical Leave.  (Doc. # 28, PX 60, at 3).  According to the T-Mobile Employee Handbook in effect during Plaintiff's employment, "Medical Leave is intended to apply when an employee is not eligible for FMLA leave or workers' compensation benefits, in order to provide such employees with an opportunity to take leave for medical conditions when appropriate."  (Doc. # 28, PX 5, at 24; Weeks Dep. 16). Although the T-Mobile leave policy provides that Medical Leave is limited to twelve weeks in a rolling backward twelve-month period (Doc. # 28, PX 60, at 2), the T-Mobile Employee Handbook also notes that "[t]he granting and duration of Medical Leave is at the discretion of the Company and requires Company approval." (Doc. # 28, PX 5, at 23).

T-Mobile has allowed employees to use vacation time when an extra week or so is needed for Medical Leave.  (Shaw Dep. 104-05).  Under the policies and procedures of T-Mobile, a supervisor has the discretion to continue a leave for one of his employees for a reasonable amount of time – usually one to two weeks. (Shaw Dep. 128).[8] Lori Dubuc, Divisional Human Resource Manager for the South at T-Mobile, recalls that the company has allowed employees to extend medical leave beyond twelve weeks. (Dubuc Dep. 42). Specifically, Dubuc recalls a cancer patient who was given thirteen or fourteen weeks of leave because the company was trying to make a

---

[7] All of Plaintiff's signed leave documents listed these requirements for FMLA leave.  (Doc. # 27, DX 7, DX 16).

[8] However, there are no T-Mobile company standards as to what amount of time extension is reasonable or not reasonable.  (Shaw Dep. 129).

decision how it would go forward with its policies.  (Dubuc Dep. 43-44).  In general, the company

allows between twelve and thirteen weeks to accommodate individuals.  (Dubuc Dep. 48).

Typically, T-Mobile communicates its Leave of Absence policy to its employees by both

describing the policy in the T-Mobile Employee Handbook and including a more detailed

explanation of the policy on One Voice, the T-Mobile Intranet site.  (Weeks Dep. 64; Reed Dep. 21;

Shaw Dep. 52, 55, 83-85; Doc. # 28, PX 32, at 16).  Plaintiff claims that she received no training

on these policies, although she did sign an acknowledgment form stating that she had read or would

read the T-Mobile Employee Handbook, which was also posted on One Voice.  (Pl. Dep. 50-51;

Weeks Dep. 64; Doc. # 27, DX 4).

### B.    Plaintiff's Leaves of Absence

Plaintiff took two leaves of absence under T-Mobile's Medical Leave policy.  (Pl. Dep. 60).

At the time Plaintiff took her first leave, she did not qualify for FMLA leave because she had not

been employed by T-Mobile for twelve months.  (Weeks Dep. 16, 135; Doc. # 27, DX9, DX17).

No one at T-Mobile told Plaintiff that she was eligible for FMLA leave, and Plaintiff did not tell

anyone at T-Mobile that she thought she was eligible for FMLA leave.  (Pl. Dep. 176-178).

Plaintiff's first Medical Leave lasted from June 30, 2003 until August 20, 2003 for a total of seven

weeks and two days.  (Pl. Dep. 63, 72).  Plaintiff makes no complaints about how T-Mobile handled

the first leave.  (Pl. Dep. 95).

On October 1, 2003, Plaintiff notified T-Mobile that she needed a second leave of absence

to have open heart surgery, which was scheduled for October 7, 2003.  (Pl. Dep. 99).  Her return to

work date was anticipated to be December 8, 2003.  (Doc. # 27, DX16).  Berry told Quann that she

did not want to replace Plaintiff while she was out on leave because she felt that she was her most

valuable employee.  (Quann Dep. 42).  Quann decided not to "back-fill" Plaintiff's job while she

was on leave.  (Quann Dep. 42-44).  Jared Larson (White) was hired when Plaintiff was out (Pl. Dep. 45), but Plaintiff was told that he would be moved when she came back from surgery.  (Pl. Dep. 179-80; Quann Dep. 49).[9]  Gene Quann and Rusty Fuller told Plaintiff that her job was safe and that it would be available for her when she returned.  (Pl. Dep. 158; Berry Aff. ¶ 4).  When Quann made this statement, however, he did not know the amount of time that Plaintiff had exhausted on her first leave, which had begun before Quann took over the Regional Manager position (Quann Dep. 120), nor was he familiar with the details of T-Mobile's leave policy, which was administered by Human Resources.  (Quann Dep. 127).

Delphine Weeks, who is also African-American, was a contract temporary employee serving as the T-Mobile Human Resources Representative who handled Plaintiff's second leave, including processing all of the paperwork.  (Reed Dep. 50; Weeks Dep. 16, 124).  Weeks was never an employee of T-Mobile, and she had never worked with, nor dealt with, the Family and Medical Leave Act prior to working at T-Mobile.  (Weeks Dep. 9, 11).

Weeks determined that Plaintiff was not qualified for FMLA leave, because she had not worked the required twelve months for T-Mobile.  (Weeks Dep. 135-36).  By letter of October 1, 2003, Weeks advised Plaintiff to submit her leave paperwork by October 11, 2003.  (Weeks Dep. 110-12; Doc. # 28, PX 15).  Weeks also provided Plaintiff with a copy of T-Mobile's Leave of Absence Policy and a set of frequently-asked questions about leaves of absence.  (Weeks Dep. 112; Doc. # 28, PX 60).  According to Human Resources Manager Fielding Shaw, Plaintiff fulfilled her obligations with regard to notifying T-Mobile regarding her requested leave of absence.  (Shaw Dep. 135). According to Weeks, however, Plaintiff did not turn in all of her paperwork by the date

---

[9] T-Mobile maintains that Larson was hired to perform some of her job duties, but that he did not replace Plaintiff.

requested in writing by T-Mobile. (Weeks Dep. 112-116). The paperwork completed by Plaintiff's doctor indicated that she needed to be off work until December 8, 2003. (Pl. Dep. 114; Weeks Dep. 81).

On October 29, 2003, T-Mobile sent Plaintiff an overnight letter instructing her that her Medical Leave would expire on October 27, 2003 and that her return to work date was October 28, 2003. (Pl. Dep. 111; Doc. # 28, PX 19; Doc. # 27, DX 17). Weeks testified that, in addition to that letter, she had a conversation with Plaintiff notifying her that her leave would expire on October 28, 2003. (Weeks Dep. 91-92). Weeks relied on the T-Mobile medical leave policy in the 2002 Employee Handbook (without consulting OneVoice) in calculating Plaintiff's leave. (Weeks Dep. 73).

Because this was her first encounter with calculating a second leave for someone who had already taken leave that year, and therefore she wished to make sure she had calculated the leave correctly, Weeks sent her computations of Plaintiff's days out on medical leave to the corporate office. (Weeks Dep. 119; Doc. # 35, PX 47). Nonetheless, Weeks admits she miscalculated Plaintiff's time and that instead of October 28, 2003, Plaintiff would have used all her leave as of November 7, 2003. (Weeks Dep. 124-134). The October 28, 2003 return date would have provided Plaintiff only a total of eleven weeks and two days of leave, not the twelve weeks allotted by the Medical Leave policy. (Weeks Dep. 124-25). Weeks did not realize she had made the error until she was approached about giving a deposition in this case. (Weeks Dep. 154). Nonetheless, because T-Mobile did not terminate Plaintiff's employment until November 10, 2003, Plaintiff received her full twelve weeks of leave, notwithstanding Week's mistake. (Weeks Dep. 134-35).[10]

---

[10] In addition, T-Mobile incorrectly calculated Plaintiff's leave time when she stated to the EEOC that Plaintiff took a little over fifteen weeks off by the time of her termination. (Dubuc Dep. 50-51;

As a T-Mobile employee, Plaintiff was eligible for Personal Leave. (Shaw Dep. 117). Personal Leave must not exceed sixty days and is obtained by securing approval from the (1) immediate supervisor, (2) then from the next level-up manager, and (3) finally from Human Resources. (Shaw Dep. 116; Weeks Dep. 138). It is "possible" that a T-Mobile employee with a medical situation could be approved for Personal Leave, although Personal Leave is usually not permitted in such instances. (Weeks Dep.138-139).

### C.    Plaintiff's Termination

After receiving the October 29, 2003 letter, Plaintiff had phone conversations with Crystal Berry, Gene Quann, and Delphine Weeks regarding her leave situation. (Pl. Dep. 110). During the conversation with Weeks, Plaintiff indicated that she would need additional time off, and Weeks inquired as to whether she could return to work before December 8, 2003. (Pl. Dep. 111-13; Weeks Dep. 35-36). Weeks told Plaintiff that if she came back before December 8, 2003, accommodations would be made for her. (Pl. Dep. 113). After the phone conversation with Weeks, Plaintiff contacted her doctor to inquire about when she might be released to return to work. (Pl. Dep. 114). Plaintiff's doctor faxed a letter to T-Mobile indicating "Patient needs to remain off work for four more weeks." (Pl. Dep. 114, 261-62, DX 20). T-Mobile never had any release or certification from a physician that stated Plaintiff could return to work prior to December 8, 2003. (Weeks Dep. 72). If Plaintiff had tried to come back to work earlier, but without a doctor's release, she would not have been allowed to do so under T-Mobile's policy that requires a doctor's release to work for employees who have been out for medical reasons. (Reed Dep. 90).

Shaw Dep. 151).

8

Weeks testified that she and Human Resources Manager Shaw made the decision together to terminate Plaintiff (Weeks Dep. 62-63), although Weeks admitted that Shaw had the final authority to approve any decision (Weeks Dep. 18; Shaw Dep. 77). The T-Mobile Leave of Absence policy did not allow back-to-back leaves unless otherwise required by law. (Reed Dep. 71; PX 54). When a T-Mobile employee exhausted her leave period and could not return to work within a reasonable period of time, the policy was to terminate the employee. (Reed Dep. 76-78; Weeks Dep. 72-73). Weeks felt Plaintiff had good reasons for going out on Medical Leave and never questioned the sincerity when she was told of the need to leave for open heart surgery. (Weeks Dep. 111). Nonetheless, Shaw and Weeks decided that the additional amount of time Plaintiff needed to be off was too long, and therefore, that termination was the only option consistent with the T-Mobile Leave of Absence Policy. (Shaw Dep. 81; Weeks Dep. 82-83).

Quann, before the termination decision was made, contacted and tried to convince Weeks to keep Plaintiff on the payroll instead of terminating her. (Weeks Dep. 72-73; Quann Dep. 56). It was Quann's view that Plaintiff was an excellent employee. (Weeks Dep. 72-74). Weeks told Quann that Plaintiff was close to exhausting her benefits and that there was nothing he could do to keep Plaintiff on the payroll. (Quann Dep. 55-56; Weeks Dep. 73).[11] Quann attempted to go over Weeks' head by calling the T-Mobile corporate office in Bellevue Washington to save Plaintiff's job. (Quann Dep. 62-63). Despite Quann's protestations and his representations that the corporate office said that he could take Plaintiff off the schedule until she could return with a doctor's note, Weeks told Quann that Plaintiff would be terminated for exhausting leave. (Quann Dep. 62-63).

---

[11] Although Quann has known employees to take time off without pay when an employee did not have enough vacation time and wanted more time off, this practice was not sanctioned by T-Mobile and instead used by Quann to manipulate the schedule so that his vacation was not interrupted. (Quann Dep. 60-61, 123-25).

Therefore, Plaintiff was informed via overnight letter that her employment was terminated effective November 10, 2003 for failure to return to work after exhaustion of leave.[12]  (Weeks. Dep. 91; Doc. # 35, PX 21).

Although Jared Larson (White) was hired to perform Plaintiff's duties while she was out (Pl. Dep. 45), he was eventually transferred from Brookwood Mall to another store.  (Quann Dep. 76-77).   Robert Blackshear, who worked directly adjacent to Plaintiff at the T-Mobile kiosk, observed that "[w]hile Ms. Plaintiff was out on medical leave, I noticed a white male named Jared Larson, was hired to take her place."  (Blackshear Decl. ¶ 7).  Prior to Plaintiff's medical leave, Blackshear had never seen Larson work at the Brookwood Mall kiosk.  (Blackshear Decl. ¶ 7). After Larson was transferred, Chris Coleman (African-American) was hired to replace Plaintiff.  (Quann Dep. 76; Doc. # 28, PX 44).

### D.      Plaintiff's Application for Rehire

After receiving the letter from T-Mobile terminating her employment, Plaintiff contacted Quann, who told her that if she could return to work by December 8, 2003 that she would still have a job.  (Pl. Dep. 115).  T-Mobile does not allow an employee to return to work without a release from a doctor.  (Reed Dep. 89).[13]  Plaintiff contacted her doctor and obtained a release to return to work on December 1, 2003.  (Plaintiff Dep. 249-250).

On December 1, 2003, Plaintiff called Quann from the Brookwood Mall kiosk to tell him she was returning to work.   (Pl. Dep. 121-22, 171).  Quann instructed Plaintiff that she would be

---

[12] At the time Plaintiff was terminated she had forty hours of vacation.  (Weeks Dep. 159).  Plaintiff was eligible for, and could have requested Personal Leave in conjunction with the three weeks she took in November prior to being terminated.  (Shaw Dep. 117).

[13] Nonetheless, T-Mobile never had a medical release from a doctor that said Plaintiff could return to work on October 28, 2003.  (Weeks Dep. 71).

required to fill out a new employment application, take an exam, and complete a background check before she could return to work. (Pl. Dep. 122). Quann told Plaintiff that a new screening test - the DDI test - had been implemented for new hires and that, because she had been terminated, she would be treated as a new hire. (Pl. Dep. 124, 254-55).[14] Gene Quann and Crystal Berry both supported Plaintiff returning to work. (Pl. Dep. 211).

Plaintiff took the one to two hour DDI Test on the computer at the T-Mobile kiosk at Brookwood Mall on December 1, 2003. (Pl. Dep. 124). While taking the test, Plaintiff stood at the kiosk and was interrupted several times. (Pl. Dep. 274). Although Plaintiff was not informed about her score on the test (Pl. Dep. 129; Clifford Dep. 112-13), she earned an overall failing score of D. Current employees who took the DDI test and made a score of D were not terminated. (Clifford Dep. 105).

Plaintiff received the standard T-Mobile rejection letter dated December 3, 2003 from Stacey Newman. (Newman Dep. 35, 40, 54-55; Doc. # 28, PX 40, PX 42). According to Newman, T-Mobile did not rehire Plaintiff because she did not pass the DDI test. (Newman Dep. 55). No specific reason was given in the December 3, 2003 rejection letter that T-Mobile sent to Plaintiff

---

[14]On October 1, 2003, T-Mobile implemented the DDI Test for applicants for the position of Retail Sales Representative, including those who had previously worked for T-Mobile and were applying for rehire. (Clifford Dep. 20-21; Newman Dep. 54-55). The DDI Test is designed to screen out unqualified candidates by assessing background experience, disposition, and work-related judgment. (Newman Dep. 31; Clifford Dep. 27). The DDI test has four bands of scoring: A, B, C, and D. (Newman Dep. 41). A passing score between A and C is required to be qualified for the Retail Sales Representative position. (Newman Dep. 35). If an applicant did not receive a passing score after October 1, 2003, T-Mobile sent the applicant a form rejection letter declining employment. (Clifford Dep. 45-46, 112-13, 119-20). Current employees, as opposed to applicants, were allowed to retake the test until they passed it. (Berry Aff. ¶ 8). Applicants who failed the test were not allowed to retest until six months after their failure date. (Clifford Dep. 112-113). Jared Larson was not required to take the DDI test because his offer letter was dated September 30, 2003, the day before the DDI test requirement went into effect. (Clifford Dep. 110).

other than "we are unable to consider you further at this time."  (Doc. # 28, PX 42).[15]  At the time the decision was made not to rehire Plaintiff, Newman did not know Plaintiff, did not know that Plaintiff had been previously employed by T-Mobile, nor did she know why Plaintiff had been terminated from T-Mobile.  (Newman Dep. 51-52).[16]  Newman also did not have any medical information about Plaintiff and did not know Plaintiff's race when she made the decision not to rehire her.  (Newman Dep. 115; Newman Aff., ¶ 5).

In addition to the DDI Test, new employees are required to complete a background check that focuses on prior employment and any prior criminal activities.  (Newman Dep. 94-95; Doc. # 27, DX 22).  T-Mobile conducts background checks on candidates for employment through a company called American Background.  (Newman Dep. 60; Doc. # 27, DX 22, 23).  The background check verifies previous employers and employment dates, and only those candidates receiving a "green" score are cleared for hire.  (Newman Dep. 59, 68).  If the previous employer responds to a background inquiry, and the information from the previous employer is inconsistent with the information listed by the candidate, a red score is returned.  (Newman Dep. 66).  If the previous employer does not respond to a background inquiry, the applicant is considered a contingent hire and still receives a green score.  (Newman Dep. 74, 85).

Plaintiff listed McDonald's as one of her previous employers during her first background check with T-Mobile.  (Newman Dep. 68-69).  American Background tried, unsuccessfully, to reach

---

[15] Plaintiff maintains that she was not told that she received a failing score, but instead was told that there were no jobs available for her to fill.  (Pl. Dep. 129, 258; Doc. # 27, DX 30, 31).  This dispute is not material, however, because Plaintiff has abandoned any claim she has for rehire.  *See* discussion of claims Section III. *infra*.

[16] Quann testified that either Stacey Newman (a.k.a Stacey Ghea) or Molly Clifford informed him that Plaintiff had a "rehire" status.  (Quann Dep. 67, 68, 89).

McDonald's to verify Plaintiff's employment, although American Background called a different telephone number than that provided by Plaintiff. (Newman Dep. 69-71; Doc. # 28, PX41). Because it never reached McDonald's, American Background reported a green score, and T-Mobile hired Plaintiff. (Newman Dep. 69-71; Doc. # 27, DX 3).

T-Mobile conducted a second background check when Plaintiff applied for rehire. (Pl. Dep. 122-23; Doc. # 27, DX 22). Plaintiff again listed McDonald's as one of her previous employers. (Newman Dep. 66; Doc. # 27, DX 24, at 3). On December 9, 2003, American Background notified T-Mobile that Plaintiff was approved as a contingent hire and provided her a green score because McDonald's had not responded to the background inquiry. (Newman Dep. 66). On December 10, 2003, American Background notified T-Mobile that Plaintiff's background score had changed to red, after McDonald's had responded to the background inquiry. (Newman Dep. 66-67). McDonald's stated in response that it was unable to verify that Plaintiff had worked there and that it had no record of Plaintiff by name or social security number. (Newman Dep. 66-67).

After the second background report from American Background, T-Mobile mailed Plaintiff a letter dated December 11, 2003, stating that she was not eligible for employment because of a failed background check and that she would need to clear up the background check to become eligible. (Pl. Dep. 272-73; Doc. # 27, DX 27). On December 17, 2003, T-Mobile sent Plaintiff another letter advising her that "the pre-employment background report we received, if correct, would prevent our company from offering you employment at this time." (Doc. # 27, DX 28). Plaintiff tried to reach American Background by telephone about her failed background check, but she never reached anyone and never left a message at American Background to return her call. (Pl. Dep. 269).

### E.        Plaintiff's EEOC Charges

Plaintiff filed her charge of discrimination with the EEOC on March 26, 2004 alleging only discrimination under the ADA.  (Doc. # 27, DX 30).    Plaintiff filed her amended charge of discrimination with the EEOC on April 22, 2004 also alleging only discrimination under the ADA. (Doc. # 27, DX 31).  Plaintiff also believes that T-Mobile retaliated against her because of her leaves of absence.  (Pl. Dep. 57, 60).  Plaintiff has never heard Crystal Berry, her immediate supervisor, Gene Quann, Regional Manager, or any other T-Mobile employee say anything derogatory towards African-Americans.  (Pl. Dep. 57, 60).

## III.    Applicable Substantive Law and Discussion

In this case, and as pertinent to the motion before the court, Plaintiff has brought claims against T-Mobile of race discrimination in violation of Title VII and 42 U.S.C. § 1981, interference with rights under the Family and Medical Leave Act ("FMLA"), and retaliation in violation of the FMLA. Although Plaintiff's complaint also includes claims of disability discrimination in violation of the American with Disabilities Act ("ADA") (Doc. # 11), Plaintiff has voluntarily abandoned those claims.  (Doc. # 34, at 35).

Additionally, although both of the parties have included in their submissions facts relevant to Plaintiff's application for rehire with T-Mobile, Plaintiff has abandoned any claim based upon the failure to rehire because she failed to respond to T-Mobile's summary judgment arguments regarding that claim. *See, e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); *Bute v. Schuller International, Inc.,* 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned); *see also Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (finding that failure to brief and argue an issue at

14

the district court is sufficient to find the issue has been abandoned); *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995); *Hudson v. Norfolk Southern Ry. Co.,* 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001). *Cf. McMaster v. United States,* 177 F.3d 936, 940-41 (11th Cir. 1999) (noting that a claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.,* 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment").

Similarly, Plaintiff's opposition to summary judgment indicates that she is now pursuing a retaliation claim only under the FMLA (even though her complaint included allegations of retaliation in violation of Title VII, Section 1981, and the ADA).   (*See* Doc. # 34, at 50)("Defendant's blanket motion that it is entitled to summary judgment on all of the plaintiff's other retaliation claims is also due to be denied . . . . As argued above, Plaintiff availed herself of a protected right and with the assistance of her direct supervisor.  [Plaintiff] sought medical leave and was initially awarded that leave only to have the leave revoked and limited contrary to her doctor's orders.  Plaintiff was terminated and Plaintiff opposed that termination . . . . There is a causal connection that exist[s] between plaintiff availing herself of a protected right and Plaintiff's termination.").  Finally, Defendant has not moved for summary judgment on Plaintiff's claims under the Fair Labor Standards Act, and therefore those claims will remain in the case and be set for pretrial.

Therefore, as part of its summary judgment analysis, the court will address only the Title VII and Section 1981 race discrimination claims and the FMLA interference and retaliation claims before it.

## A.    Race Discrimination Claims Under Title VII and Section 1981

As a threshold matter, the court notes that Plaintiff's Title VII race discrimination claim -

but not her Section 1981 race discrimination claim - is procedurally barred because Plaintiff failed

to allege race discrimination in her EEOC charges.  42 U.S.C. § 2000e-5(e)(1); *Alexander v. Fulton*

*County, Ga.*, 207 F.3d 1303, 1332 (11th Cir. 2000); *Mulhall v. Advance Security, Inc.*, 19 F.3d 586,

589 n. 8 (11th Cir. 1994).  Unless an exception applies, Title VII requires a plaintiff to file an EEOC

charge of discrimination within 180 days of the alleged discrimination and prior to a lawsuit, or her

claim is barred.  42 U.S.C. § 2000e-5(e); *Ross v. Buckeye Cellulose*, 980 F.2d 648, 657-58 (11th Cir.

1993).  Therefore, a Title VII complaint is limited to the scope of the EEOC investigation reasonably

expected to grow out of the Plaintiff's EEOC charge.  *Long v. Florida*, 805 F.2d 1542 (11th Cir.

1986); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1226 (11th Cir. 2001); *Alexander v. Fulton*

*County*, 207 F.3d 1303, 1332 (11th Cir. 2000).  Nonetheless, the Eleventh Circuit has noted a

reluctance "to allow procedural technicalities to bar claims brought under [Title VII]" and thus has

found that "'the scope of an EEOC complaint should not be strictly interpreted.'" *Sanchez v.*

*Standard Brands, Inc.*, 431 F.2d 455, 460-01, 465 (5th Cir. 1970).  Accordingly, judicial claims are

allowed if they "amplify, clarify, or more clearly focus" the allegations in the EEOC complaint,

although  allegations of new acts of discrimination are inappropriate. *Wu v. Thomas*, 863 F.2d 1543,

1547 (11th Cir.1989).

It is undisputed that both Plaintiff's initial and amended EEOC charges classified her claim

as one under the ADA and never mentioned race.  On both forms, Plaintiff states: "I believe that I

was discriminated against in violation of the American with Disabilities Act of 1990, as amended

due to my prior medical history and the perception I believe the employer to have regarding my

medical condition."  (Doc.# 27, DX 30, 31).  Accordingly, the court finds that Plaintiff's Title VII

race discrimination claim is procedurally barred as a new allegation of discrimination that could not be reasonably expected to grow out of an investigation of either of Plaintiff's ADA EEOC charges. *See Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1225 (11th Cir. 2000)(finding that a reasonable investigation based on an EEOC charge alleging discrimination under the ADA and the Florida Human Rights Act did not and would not encompass retaliation based on complaints about national origin discrimination).

In any event, as noted earlier, Plaintiff has brought her race discrimination claims pursuant to both Title VII, which requires the filing of an EEOC charge in advance of filing a judicial complaint, and Section 1981.  Section 1981 does not include an administrative filing prerequisite for filing suit. *Caldwell v. Nat'l Brewing* Co., 443 F.2d 1044, 1046 (5th Cir. 1971).  Accordingly, Plaintiff's Section 1981 claim is not procedurally barred.

However, for summary judgment purposes, this is a distinction without a difference because both Section 1981 and Title VII utilize the same analytical framework and requirements of proof. *See Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).  Therefore, for the reasons outlined below, the court finds that even assuming that Plaintiff has fulfilled all of the procedural prerequisites for her race discrimination in termination claims, both her Title VII and Section 1981 claims fail as a matter of law.

### 1.    *Prima Facie* **Case of Termination**

To establish a *prima facie* case of discriminatory discharge, Plaintiff must show: (1) membership in a protected class, (2) that she was qualified for the job, (3) that she was discharged, and (4) that she was replaced by a non-minority.  *Ross v. Rhodes Furniture, Inc.,* 146 F.3d 1286, 1290 (11th Cir. 1998); *Hawkins v. Ceco Corp.*, 883 F.2d 977, 982 (11th Cir.1989). In this case, the

parties have focused their dispute on the fourth element of the *prima facie* case regarding replacement by a non-minority.

Although Plaintiff maintains that she was replaced by a White employee, Jared Larson, T-Mobile argues that Plaintiff was actually replaced by another African-American employee, Chris Coleman.  The undisputed evidence indicates that Quann hired Larson on September 30, 2003 - mere days before Plaintiff took her second Medical Leave - and that Larson initially was assigned to fulfill Plaintiff's duties while she was out on leave with the expectation that Plaintiff would resume those duties when she returned.  (Quann Dep. 48, 50-51; Plaintiff Dep. 49).  Nonetheless, Larson continued to perform Plaintiff's duties even after she was terminated and during her unsuccessful application for rehire.  (Quann Dep. 76 ("Q: 'After Ms. Calhoun was not allowed to come back to work, did Mr. Larson stay at that Brookwood location?  A: 'He did.'")).  Although Larson was eventually transferred from Brookwood Mall to another store and Coleman was hired into that position, that transition did not occur until sometime in "January or February" of 2004, several months after Plaintiff's November 10, 2003 termination.  (Quann Dep. 76; Doc. # 28, PX 44).

Based upon these facts found in the record, the court cannot conclude, as Defendant argues, that it is undisputed Larson was not hired to replace Plaintiff, but instead was merely an existing employee "filling in temporarily for an individual out on sick leave." (Doc. # 38, at 15-16).  Rather, viewing the facts in the light most favorable to Plaintiff, there is at least a dispute about what Lawson was hired to do.  Accordingly, the court finds that Plaintiff has fulfilled her *prima facie* obligation.

2.      **Pretext**

Having found that Plaintiff has established a *prima facie* case of race discrimination, the court turns to the analysis of T-Mobile's articulated non-discriminatory reason for termination and whether Plaintiff has presented sufficient evidence to allow a rational trier of fact to reject that reason. *Jackson v. State of Ala. State Tenure Com'n*, 405 F.3d 1276, 1289 (11th Cir. 2005).  For the reasons outlined below, the court finds that Plaintiff has not fulfilled her burden of showing a triable issue exists and, therefore, Defendant is due summary judgment on this claim.

T-Mobile maintains that it terminated Plaintiff for exhausting her available leave,[17] not because of her race.  T-Mobile points to its Medical Leave policy, which limits medical leave to twelve weeks during a rolling backward twelve month period (Doc. # 28, PX 60), and notes that it is undisputed that Calhoun could not return to work until four or five weeks after October 28, the date Weeks (who is African-American like Plaintiff) calculated to be Calhoun's return-to-work date under T-Mobile's policy.  Weeks and Human Resources Manager Fielding Shaw, who is White and who had the final authority to approve any decision, decided that the additional weeks that Plaintiff

---

[17] Plaintiff's intimation that T-Mobile has been inconsistent in its reason for termination is unavailing.  Whether T-Mobile characterizes Plaintiff's termination as due to *exhaustion* of leave or due to *exceeding* the amount of leave is a mere semantic dispute.  Moreover, even though Lori Dubuc, who drafted the EEOC response but was not involved in the termination decision, mistakenly represented to the EEOC that Plaintiff was terminated because "when her return to work date [from medical leave] arrived, Ms. Calhoun refused to return *upon a medical release provided by her doctor*" (Doc. # 28, PX 8; Dubuc Dep. 22, 85-87), Dubuc admits that her error in adding "upon a medical release provided by her doctor" was simply the result of ignorance about the specific facts of Plaintiff's situation.  In any event, there is no dispute that the earliest Plaintiff's doctor would release her to work was December 1, 2003 - after her termination. (Plaintiff Dep. 249-250).  Dubuc's admitted mistake in drafting the EEOC response does not demonstrate pretext given that neither party has ever asserted in this litigation that Plaintiff's doctor had released her to return to work at the time she was terminated on November 10, 2003.  Instead, Defendant has always maintained that Plaintiff was terminated because she had exhausted her leave but failed to return to work.  Therefore, regardless of Dubuc's error, it is clear that Defendant has consistently maintained that Plaintiff's employment was terminated due to exhaustion of medical leave.

requested for leave were too long and that termination was the only option consistent with the T-Mobile Leave of Absence Policy.  (Weeks Dep. 18, 62-63, 82-83; Shaw Dep. 77, 81).[18]

In response, Plaintiff offers the following evidence to demonstrate pretext: (1) Weeks miscalculated Plaintiff's leave time; (2) Quann fought to retain Plaintiff but was rejected by Weeks; (3) White employees that wanted more leave but did not have the requisite leave time were allowed to take extra leave without an adverse employment action; and (4) T-Mobile did not comply with various company policies in calculating and allowing Plaintiff's leave time.  The court will address each argument in turn.

First, although it is undisputed that Weeks miscalculated the appropriate leave time that Plaintiff was due - the October 28, 2003 return date would have provided Plaintiff a total of only eleven weeks and two days of leave, not the twelve weeks allotted by the Medical Leave policy - Eleventh Circuit law is clear that it is not enough for Plaintiff to show that Weeks was mistaken in her belief that Calhoun had exceeded her available leave as of October 28.  Rather, Plaintiff must show that the miscalculation was more than an honest mistake and instead a pretext to cover up race discrimination.  *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452-53 (11th Cir. 1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race' and the employer has not violated § 1981.").  Plaintiff has not fulfilled this burden.  There is no evidence that Weeks' miscalculation was anything but an honest mistake.   In fact, Weeks did not realize she had made

---

[18] Although Defendant makes much of the fact that Weeks is African-American like Plaintiff, thus imposing a more difficult burden on Plaintiff to show discriminatory intent on her part, the undisputed evidence shows that Shaw (who is White), not Weeks, had the final say in Plaintiff's termination decision. (Shaw Dep. 77; Doc. # 35, Ex. F, at Defendant's Interrogatory Answers 4 and 10).  Indeed, Weeks, was a contract employee from a temporary employment agency and never was a T-Mobile employee, nor a manager.  (Weeks dep., pp. 8-9).

the error until she was approached about giving a deposition in this case. (Weeks Dep. 154). Although Weeks testified that she transmitted her calculations to the corporate office for approval, the fact that the miscalculation was undetected by the corporate office is not, in itself, sufficient to establish race discrimination. (Weeks Dep. 1 19; Doc. # 28, PX 47). Plaintiff has offered no evidence that the miscalculation of Plaintiff's leave was anything but an honest mistake that slipped through the cracks.[19]

Second, Plaintiff contends that Quann's attempts to save Plaintiff's position demonstrate that T-Mobile's stated reason of termination due to exhaustion of leave is pretextual. To the contrary, the court finds that the efforts of Quann (who is White) simply show that T-Mobile valued Plaintiff as an employee and in fact wanted to keep her employed were it not for the leave situation. T-Mobile has never taken the position that Plaintiff's termination had anything to do with her work performance. Quann's desire to save Plaintiff's job was thwarted because of something beyond his control - the fact that she had exhausted her leave. (Quann Dep. 62-63). Even though Quann maintains that the corporate office told him that he could take Plaintiff off of the schedule until she was released to return to work (Quann Dep. 56-59), he nonetheless was informed by Weeks in Human Resources that Plaintiff would be terminated because she had no more leave. Weeks' opposition to Quann's request that Plaintiff receive special treatment, and her insistence on compliance with T-Mobile's Leave Policy, are not evidence of pretext. Plaintiff has not presented any evidence that would allow a reasonable trier of fact to conclude that Weeks (who is African-

---

[19] In any event, the court notes that the calculation mistake had no effect on the termination of Plaintiff. Once corrected, T-Mobile determined that Plaintiff would have used all her leave as of November 7, 2003. (Weeks Dep. 124-134). Nonetheless, because T-Mobile did not terminate Plaintiff's employment until November 10, 2003, Plaintiff received twelve weeks of leave notwithstanding Weeks' mistake. (Weeks Dep. 134-35)

American like Plaintiff) thwarted the efforts of Quann (who is White) to save Plaintiff's job because Plaintiff is African-American.

Next, Plaintiff contends that other White employees who wanted additional vacation time or extended personal time, but who had exhausted their leave, were allowed to do so without suffering an adverse employment action. Although the undisputed facts do demonstrate that other employees were allowed to take one to two extra weeks of time off even after the exhaustion of their official leave, there is no evidence that those employees were White and more importantly, there is no evidence that *any* employee was allowed *four or five* additional weeks of time off after exhaustion of the twelve-week limit.

Shaw, Quann, and Dubuc all recognized that other employees have been allowed to use vacation time or unpaid leave when an extra week or so is needed for Medical Leave. (Quann Dep. 60-61; Shaw Dep. 104-05; Dubuc Dep. 42). In fact, under the policies and procedures of T-Mobile, a supervisor has the discretion to continue a leave for one of his employees for a reasonable amount of time. (Shaw Dep. 128). Although there are no official T-Mobile company standards as to what amount of time extension is reasonable or not reasonable (Shaw Dep. 129), T-Mobile employees testified that one to two additional weeks is considered reasonable (Shaw Dep. 128-29; Dubuc Dep. 48), and that the longest period of time another employee has been allowed to exceed his or her leave time was two extra weeks for a cancer patient in need of treatment. (Dubuc Dep. 43-44). Because Plaintiff had requested at least another month off after the exhaustion of her twelve weeks of leave, Shaw, with Weeks' input, determined that the amount of time sought was too long and therefore could not be accommodated. (Shaw Dep. 104). Plaintiff has failed in her effort to show pretext based upon any non-minority comparator who was treated more favorably because she has not shown that any similarly situated White employee was granted four or five extra weeks of time

off in addition to the standard twelve weeks.  *See Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998), *modified in non-relevant part on denial of reh'g*, 151 F.3d 1321 (11th Cir. 1998).

Finally, Plaintiff, in an effort to show pretext, argues that T-Mobile did not comply with certain company policies when appropriating her leave.  Plaintiff insinuates that T-Mobile placed a twelve-week limit on her leave time when the Employee Handbook in effect at the time of Plaintiff's employment placed no limit on the amount of leave that Plaintiff could take.   The undisputed evidence shows otherwise.  Although the August 13, 2002 Employee Handbook in effect at the time does not specify a limitation on leave time, it does note that the contents "are subject to change from time to time" and reminds Plaintiff that "it is up to you to make sure that you are accessing the latest version … [through] our Intranet." (Doc. # 27, PX 5 at 4).  T-Mobile's Medical Leave Policy in effect at the time, which was accessible online, did include a limitation of twelve leave weeks.  In fact, the evidence before the court includes seven revisions of T-Mobile's Medical Leave Policy that were effectuated during the relevant time period (including 11/13/02, 1/9/03, 1/17/03, 1/23/03, 5/16/03, 6/19/03, and 6/24/03) and all seven versions provide: "The maximum allowable time for a Medical Leave is twelve weeks."  (Doc. # 27, at DX 41).  The court finds no basis for concluding that T-Mobile created a twelve-week limit on Plaintiff's leave when none existed.

Plaintiff also contends that T-Mobile violated company policy by not allowing her to use vacation to extend her Medical Leave especially since she was approved for short-term disability. Plaintiff's argument confuses several different issues.  First, vacation leave - which is a type of paid time off - does not extend the available leave period but merely allows an employee to be paid while out on leave.  (Doc. # 28, PX 5, PX 60). Second, although T-Mobile permits an employee to use

vacation time to receive pay during the forty-hour waiting period for short-term disability (Shaw Dep. 94-95), that option was not available in Plaintiff's case because she did not submit her leave paperwork until she had already been out on leave for almost two weeks, and by the time her leave paperwork had been processed, she was already receiving short-term disability benefits.  (Weeks Dep. 113-116).  In any event, Plaintiff's receipt of short-term disability benefits would have limited her ability to receive vacation or paid time off, because vacation is only necessary to cover the forty-hour waiting period. (Reed Dep. 84-86).There is simply no indication that T-Mobile violated its policies with regard to calculating Plaintiff's paid time off.[20]

Although the court finds that the undisputed evidence shows no violation of T-Mobile's policies with regard to the treatment of Plaintiff, even assuming that T-Mobile did deviate from one or more of its company policies, that aberration - standing alone - does not demonstrate discriminatory animus. *Mitchell v. USBI Co.*,186 F.3d 1352, 1355-56 (11th Cir. 1999); *see EEOC v. Texas Instruments Inc.*, 100 F.3d 1173, 1182 (5th Cir.1996) (finding that deviation from company policy is not evidence of discrimination, absent a nexus between deviation and employee's protected status); *Friedel v. City of Madison*, 832 F.2d 965, 973 (7th Cir.1987) (holding that inaccurate application of departmental policy not enough to prove discrimination); *see also Berg v. Florida Dep't of Labor and Employment Security*, 163 F.3d 1251, 1255 (11th Cir.1998) (finding that plaintiff failed to support claim of ADA violation by arguing that state agency had failed to apply its policies correctly, absent showing that policies were misapplied because of his disability).  *Cf.*

---

[20] As Plaintiff also points out, in light of Defendant's policy requiring a medical release for employees to return to work after medical leave, she could not have returned to work on the day she was terminated because her doctor did not release her to work until several weeks later.  Although Plaintiff's situation does present an interesting conundrum, Defendant's apparently conflicting policies are not evidence of pretext.  There is no evidence that these policies were applied any differently in Plaintiff's situation because of her race.

24

*Brown v. American Honda Motor Co.*, 939 F.2d 946, 952 (11th Cir.1991) ("It is difficult to hold that a practice which affects ... all races in the same manner is actually designed to conceal a racially discriminatory motive.").  To establish pretext, a plaintiff must show that the deviation from policy occurred in a discriminatory manner. *Rojas v. Florida*, 285 F.3d 1339,1344, n.4 (11th Cir. 2002). In this case, Plaintiff cannot make such a showing and there is no evidence that "any deviation from [T-Mobile's policies] in this case ... constitute[s] evidence of pretext."  *Walker v. Prudential Property and Cas. Ins. Co.*, 286 F.3d 1270, 1279 (11th Cir. 2002).

Accordingly, because the court finds that, based upon the undisputed evidence, a rational trier of fact could not conclude that Defendant's stated reason for terminating Plaintiff's employment - exhaustion of leave - was a pretext to cover up race discrimination, summary judgment in favor of Defendant is due to be granted as to Plaintiff's Title VII and Section 1981 race discrimination claims.

B.     FMLA Claims

Congress created two causes of action under the FMLA:  (1) claims based on interference with FMLA rights, such as improper denial of FMLA leave, and (2) claims based on an employer's retaliation or discrimination against an employee for exercising his rights under the FMLA.  29 U.S.C. § 2615(a)(1), (2).   In this case, Plaintiff claims both.  A retaliation claim requires proof of intent; an interference claim does not.  *Strickland v. Water Works and Sewer Bd.*, 239 F.3d 1199, 1206-07 (11th Cir. 2001).

1.     Interference under the FMLA

With respect to Plaintiff's interference claim, the court finds that summary judgment in favor of Defendant is appropriate because Plaintiff was not eligible for FMLA protection.  An eligible employee under the FMLA is defined as: "an employee who has been employed (i) for at least

25

twelve months by the employer … and (ii) for at least 1,250 hours of service … during the previous twelve-month period." 29 U.S.C. § 2611(2)(A).  Cases interpreting this provision contemplate a one-year anniversary date.  *See, e.g., Walker v. Elmore Co. Bd. of Educ.*, 379 F. 3d 1249, 1253 (11th Cir. 2004) ("The day Walker would have become eligible for FMLA leave, however, was her twelve-month anniversary at the school, August 9, 2000").  Because Plaintiff has failed to demonstrate by a preponderance of the evidence that she was entitled to FMLA protection, she cannot have a valid claim of interference.  *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1353 (11th Cir. 2000).  In this case, the court finds that Plaintiff did not reach her one-year anniversary date because it is undisputed that she began her employment with T-Mobile on November 17, 2003 and ended her employment on November 11, 2004.

Plaintiff's argument that she was employed for 52 weeks and actually became eligible for FMLA leave as of 12:01 am on Sunday, November 9, 2002 prior to the termination of her employment (Doc. # 35, Ex. C), misses the mark.  Unfortunately for Plaintiff, the 52-week provision only applies to "intermittent, occasional, or casual" employees. 29 C.F.R. § 825.110(b) ("The twelve months an employee must have been employed by the employer need not be consecutive months. For purposes of determining whether intermittent/occasional/casual employment qualifies as 'at least twelve months,' 52 weeks is deemed to be equal to twelve months"); *see also Walker v. Elmore County Bd. of Educ.*, 223 F. Supp. 2d 1255, 1258 (M.D. Ala. 2002) (finding that the "52-week safe harbor" only applies to "intermittent, occasional, or casual employees").  Plaintiff was not such an employee because she was employed continuously from November 17, 2002 until November 10,

26

2003.[21] Accordingly, Plaintiff's employment with T-Mobile falls short of the twelve-month period required for FMLA protection and her interference claim fails.

Even assuming that Plaintiff was entitled to FMLA coverage – which she was not – summary judgment is appropriate on Plaintiff's interference claim for an alternative reason: there is no dispute that she received all of the leave to which she would have been entitled under the FMLA regardless of whether she was actually entitled to it as an "eligible employee." The FMLA provides that a qualified employee is entitled to twelve weeks of unpaid leave each year in any twelve-month period to provide care for a newly born/ adopted child or for a family member who has a serious health condition or because that employee has a serious health condition that renders him unable from performing the functions of his job. 29 U.S.C. § 2612. Leave may be taken at a single time, intermittently, or on a reduced schedule. 29 U.S.C. § 2612(a)(1), (b)(1); 29 C.F.R. § 825.203.

The parties agree that as of the date of her termination on November 10, 2004, Calhoun had received twelve weeks of leave during the twelve months preceding that date (she was hired on November 17, 2003). Even assuming Calhoun was an "eligible employee," the FMLA only mandates twelve weeks of leave, and the Supreme Court has rejected attempts to provide employees more protected leave than required by the statute. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 96 (2002); *see also Norman v. Southern Guaranty Insurance Company*, 191 F.Supp.2d 1321, 1331-32 (M.D. Ala. 2002) (holding that an additional twelve weeks of FMLA leave is not required

---

[21] Plaintiff's reliance on *Babcock v. BellSouth Advertising and Publishing Corp.*, 348 F.3d 73 (4th Cir. 2003) for the 52-week rule is also misplaced. In *Babcock*, the plaintiff entered employment on June 1, 1999, and was not terminated until June 14, 2000. *Babcock*, 348 F.3d at 75. The Fourth Circuit made clear that had BellSouth terminated the plaintiff at any point prior to June 1, she would not have been eligible to file an FMLA claim. *Babcock*, 348 F.3d at 77-78.

where employee already provided leave in excess of twelve weeks during a twelve-month time frame.); *McGregor v. Autozone, Inc.,* 180 F.3d 1305, 1308 (11th Cir. 1999) ("Where an employer such as defendant exceeds the baseline twelve weeks by providing not only more leave than FMLA … the employer should not find itself sued for violating FMLA."). Although Defendants did not technically designate Plaintiff's leave time as FMLA leave, that is of no consequence. Employees are not entitled to additional leave simply because the employer failed to designate the time. *Ragsdale*, 535 U.S. at 96. Because Plaintiff has not offered any evidence to refute that Defendant provided her with all of the substantive benefits that she was entitled to under the statute, summary judgment is appropriate on Plaintiff's FMLA interference claim even assuming that she was eligible for FMLA protection.

### 2.    Retaliation under the FMLA

To establish a prima facie case, Plaintiff must demonstrate that (1) she availed herself of a right protected under the FMLA; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action. *Graham v. State Farm Mutual Ins. Co.*, 193 F.3d 1274, 1283 (11th Cir. 1999); *Brungart v. BellSouth Telecommunications, Inc.,* 232 F.3d 791, 798 (11th Cir. 2000). With respect to retaliation under the FMLA, Plaintiff must also present proof that Defendant acted with discriminatory intent. *Strickland v. Water Works & Sewer Board of the City of Birmingham*, 239 F.3d 1199, 1206-07 (11th Cir. 2001).

Fatal to Plaintiff's retaliation claim is her ineligibility for FMLA coverage at the time of her leave. The Eleventh Circuit made clear in *Walker v. Elmore County Bd. Of Educ.*, 379 F.3d (11th Cir. 2004), that an employee must be eligible for FMLA leave to assert a claim for retaliation under the FMLA. *Walker*, 379 F.3d at 1253 ("There can be no doubt that the [leave] request – made by

28

an ineligible employee for leave that would begin when she would still have been ineligible – is not protected by the FMLA.").

Plaintiff's extensive citation to the district court opinion in *Walker* is inapposite.  (Doc. # 34, at 44-46).  Although the district court held that "where the employee, *before* she becomes eligible for FMLA, [puts] the employer on notice of her intent to take FMLA leave *after* she becomes eligible for FMLA coverage, logic requires that the FMLA be read to require that the employee be permitted to make a retaliation charge against the employer for an adverse-employment action," *Walker v. Elmore County Bd. of Educ.* 223 F.Supp.2d 1255, 1259 -1260 (M.D. Ala.2002), the Eleventh Circuit specifically declined to rule on the validity of that holding because that was not the situation in Walker.   In *Walker*, the plaintiff "would not have been eligible for leave even at the time her leave was to begin.  Instead, Walker's request was for leave that would begin several days before she would have become eligible had her contract been renewed."  *Walker,* 379 F.3d at 1253.

Such is the case here.  It is undisputed that Plaintiff had not worked a full year and was not FMLA-eligible at the time she requested her second leave on October 1, 2003, nor was she FMLA-eligible at the time her leave began.  In fact, Plaintiff would not have been eligible for FMLA protection until long after she had been out on leave, *i.e.*, after she had exhausted all twelve weeks of leave, and after November 10, 2006, the date of her termination.  *See* discussion Section III.B.1 "Interference under the FMLA,"*supra*.  Accordingly, *Walker* is controlling and this court finds that Plaintiff's ineligibility for FMLA leave is fatal to her FMLA retaliation claim.   Thus, Defendant is due summary judgment on this claim as well.

**IV.**   **Conclusion**

For the reasons stated above, the court finds that Defendant's motion for summary judgment is due to be granted.  A separate order will be entered.  By future order, the court will set the remaining FLSA claims for pretrial conference.

**DONE** and **ORDERED** this _____20th_____ day of December, 2006.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE